THE DORA.

THE COMOL CUBA.

PANKO v. COMMERCIAL MOLASSES CORPORATION.

No. 37.

District Court, E. D. Pennsylvania.

Nov. 25, 1942.

Abraham E. Freedman (of Freedman & Goldstein), of Philadelphia, for libellant.

John B. Shaw (of Krusen, Evans & Shaw), of Philadelphia, for respondent and claimant.

BARD, District Judge.

This is an action in admiralty to recover damages for personal injuries suffered by the libellant in falling off a gangway on the Steamship "Dora", and for maintenance and cure. I make the following special findings of fact:

1. On February 27, 1938 libellant was employed as a fireman aboard the Steamship "Dora" which was then moored at a dock at Ponce, Puerto Rico, taking on a cargo of molasses.

2. The vessel was moored at a distance of eight or ten feet from the dock because of clusters of pilings along the edge of the dock, and the gangway extended from a point near her No. 4 hatch to the dock.

3. About 10:30 that night libellant returned from shore leave.

4. Libellant fell into the water at a point approximately 150 feet forward of the gangway.

5. The condition in which the gangway was maintained was not the cause of the libellant's fall and injury.

6. The officers of the respondent had no knowledge that libellant required medical attention or care or that his condition, after the accident, necessitated complete rest.

### Discussion.

The facts upon which the question of libellant's claim in this case depends are in the sharpest controversy. The uncontroverted facts are that libellant was a fireman on the Steamship "Dora" on February 27, 1938, which was in the Port of Ponce, Puerto Rico, taking on a cargo of molasses. The ship was bow in and moored port side to a dock from which the molasses was being loaded through a cargo hose. She was at a distance of from eight to ten feet from the dock because of clusters of piles. A warehouse adjoined the dock, which was narrow, and the door from the warehouse to the dock was opposite a point between the No. 1 and No. 2 hatches of the ship. Because of the shallow water the ship was not all the way in and her No. 4 hatch was opposite the end of the dock. A gangway had been placed from the ship to the dock near this point. About 8:30 P. M. libellant, together with two other members of the crew, went ashore. About 10:30 P. M. and at some point in his route back to the ship libellant fell into the water. One of his companions yelled "man overboard". Some of the ship's officers and other crew members came to the scene, a life preserver was procured and thrown to the libellant, and subsequently a jacob's ladder was lowered from the ship at a point between the No. 1 and No. 2 hatches, where libellant then was, and he came aboard. He returned to his quarters and subsequently stood his watch from 4 A. M. until 8 A. M. the next morning, as well as all the other watches on his trip back to the port of Philadelphia, where the ship arrived on March 7, 1938, and libellant was paid off and discharged. On March 11th he was examined by a Dr. Zibelman in Philadelphia, who recommended hospitalization. On March 13, 1938 he entered a hospital and remained under treatment continuously until September 11, 1939. His condition was diagnosed by Dr. Zibelman and the hospital physicians as traumatic pleurisy. A rib resection operation was performed upon him. Following his discharge from the hospital he obtained immediate employment and has been employed regularly, but is unable to perform heavy work without discomfort.

The principal issue of fact is where libellant fell into the water and what caused his fall. Libellant and one of the members of the crew who accompanied him ashore and back to the ship testified that libellant fell as he was on the gangway returning to the ship, and attributed the fall to the insecurity of the gangway, the insufficiency of the lighting near it, and the absence of the gangway guard from his post. Libellant further testified that there was some-

thing on the gangway "which he believed" was a piece of wood, because "it could not have been anything else", on which he stepped, precipitating his loss of balance and fall. The defense of the respondent was that the libellant was intoxicated and fell off the dock some 150 feet forward of the gangway. In support of this latter contention respondent produced testimony of several of the ship's officers that they arrived on the scene promptly after the accident and found the libellant swimming around in the water between the No. 1 and No. 2 hatches, from which point he emerged when rescued.

On this issue I am constrained to find for the respondent. It is undisputed that libellant was about 150 feet forward of the gangway when he emerged from the water. The testimony of his own witness was that this witness had yelled "man overboard" immediately after libellant fell into the water, and this gives credence to the testimony offered on behalf of the respondent that a life preserver was thrown to libellant within a minute after the accident and that at that time he was between the No. 1 and No. 2 hatches, a considerable distance from the gangway. Further corroboration of the fact that libellant was at that point almost immediately after he fell into the water was given by the gangway watchman, who was no longer in respondent's employ at the time he testified. Libellant's explanation of the fact that he emerged from the water at a point a substantial distance forward of where he claims to have fallen in seems highly improbable. His testimony was that he was in the water for approximately five minutes before a life preserver was thrown to him and that during that time he was swimming forward. It may be noted that he was clothed at the time and, according to his own testimony, he struck his face and left side on the piles as he fell. Under all of the evidence, libellant's testimony is not convincing.

There also seems to be good reason to believe that libellant was under the influence of liquor to some extent at least. One witness testified that after he came up on deck out of the water he was pugnacious and had smelled of liquor. Panko in his own testimony admitted that while he was ashore he had "maybe one beer", and in the statement which he subsequently gave to the hospital officials as part of the history of his accident, he said that he had had "a few drinks".

It is also of some significance that libellant testified that he said nothing to the ship's officers, when he emerged from the water, concerning the cause of his fall. If in fact his fall had been caused by the insecurity of the gangway or presence of a piece of wood thereon and the lack of illumination, it hardly seems likely that he would not have made some comment or complaint to the ship's officers at the time.

There are a great many other disputed facts as to which there are inconsistencies of testimony offered on behalf of both parties. The case involved considerable difficulty in determining, from the record, where the truth lay, but on the major issue of how the accident occurred the libellant has failed to carry the burden of proof to establish the facts alleged in his libel.

Wholly apart from the liability asserted as a result of respondent's alleged negligence with respect to the gangway, libellant asserts a right to recover damages for the failure of the respondent to provide him with proper medical care and attention during the return voyage following the accident. On this question the testimony is likewise in sharp conflict. Libellant's evidence was that because of his condition, as a result of the accident, he sought to have another member of the crew stand his watch from 4 A. M. to 8 A. M. the following morning, but that he was ordered to stand the watch himself under threat of punishment. He further testified that on the return voyage he told his superior officers on a number of occasions that he felt ill, but they merely laughed at him and furnished him no medical attention. The ship's officers testified that libellant stood his watch on the morning after the accident without complaint or without requesting to be relieved, and that he likewise stood all his watches on the return voyage without complaint. In reply to inquiries by these officers as to his condition, libellant replied that he felt no ill effects.

I am not convinced of the libellant's version of this issue. The probabilities are that libellant was somewhat embarrassed about his intoxicated condition at the time he met with the accident and preferred to minimize the effects of the accident. This is consistent with the fact referred to earlier in this opinion, that libellant's testimony disclosed that when he emerged from the water after his fall he made no remonstrance against the allegedly insecure and

dangerous condition in which the gangway was maintained. Throughout he appears to have considered his fall his own fault and to have made as little of it as possible.

On the second cause of action for maintenance and cure, it appears that the libellant had incurred no expense or obligation for sustenance or medical attention. He was hospitalized in the U. S. Marine Hospital in Baltimore for eighteen months, and upon his discharge from the hospital he was able to return to profitable employment without any hiatus of further convalescence. The libellant is therefore not entitled to any sum on account of this cause of action.

I make the following conclusions of law:

1. Libellant has failed to carry the burden of proof upon him to establish that he was injured as a result of respondent's negligence.

2. Libellant has not proved that he fell from the gangway of the steamship "Dora", and hence his claim for injuries resulting therefrom is not cognizable in admiralty.

3. Respondent was not negligent in failing to provide proper medical care and attention to the libellant on the return voyage because it had no knowledge that his condition required it.

4. The libellant is not entitled to any sum of money for maintenance and cure.

5. The libel is dismissed.